Chief Justice Marshall
delivered the opinion of the Court.
In 1785, a patent was granted by the commonwealth of Virginia, to James Taylor, for 1,500 acres of land, at the junction of the Licking and Ohio rivers, lying on both rivers, and above the mouth of Licking. In-1791 and 1792, Hubbard Taylor, son of the patentee, laid off a portion of said land, at the *768 confluence of the rivers, into streets and alleys, as a town, to which he gave the name of Newport; and made a plat or plan thereof, representing it as,situated on the banks of the said rivers, at their junction ; and representing, between the Ohio river and the lots fronting on it, a street, and between it and the river an open space, extending to the river, without any line or letter upon it. This space included a narrow and irregular strip of land on top of the bank, and extended to the water’s edge. Whether the line dividing the front street from this open space was unbroken, or had breaks or openings opposite to the cyoss streets coming into it, is not entirely certain, nor is it deemed very material. Besides this representation of the town, the original plat or map, had upon it a writing executed by the attorney of the patentee, stating the conditions upon which the lots wei’e to be sold or donated. But these related principally to the terms of payment, and the improvement of the lots by purchasers, and intimated no reservation to the proprietor of any right not indicated by the plat and the fact of his ownership. It appears that some lots were sold and conveyed by reference to this plat, before August, 1795, when a resurvey was made by John Roberts, under the direction of James Taylor, a son, and then the attorney in fact of the patentee, and a new plat was made. By this re-survey and plat, the town was extended up the Ohio river somewhat beyond its original limits. Upon the space between the additional lots and the river, were written the words, “a common;” and -on that between the original lots and the river, were written the words, “The Esplanade, to remain a common forever.” The conditions indorsed on the original plat were transferred' to this new one, but the forfeiture for non-improvement - within three years, which was one of the original conditions, was relinquished. Whether there had been any improvements, or were any actual residents within the town, or how many, when this re-survey was made, does *769 not certainly appear. It seems, however, that in January, 1794, the county court of Mason county, in which Newport was then included, had, on motion of James Taylor, (the patentee,) established a ferry from his lands on the Ohio river, over the same, in 9 front of the town of Newport, to have and receive the same fare as is allowed from the opposite shore; and in the same year the same court had, on motion of-Bartle, to whom a lot fronting towards the river had been conveyed, granted to him a ferry across the Ohio, from Newport. But in 1795, this court, upon the appeal of James Taylor, reversed the order making that grant, because it did not appear that Bartle had any land on the Ohio river, and the ownership of land on that river, has been made by statute necessary to the grant of a ferry across it-,, from this side.
In September, 1795, there seems to have been a public sale of lots in Newport, made, of course, by the new plat. But how many lots were sold does not appear. And in December, 1795, an act was passed to establish the town of Newport, then included in the county of Campbell. This act vested the “land comprehended in said town, agreeably to a plat made by John Roberts,” with certain exceptions, in certain named trustees; and, besides other provisions for keeping up the town,provided in the seventh-section, “that such part of the said town as lies between the lots and the rivers Ohio and Licking, as-will appear by reference to said plat, shall forever remain for the use and benefit of said town, for a common; reserving to the said James Taylor, his heirs and assigns, every advantage and privilege which he has not disposed of, or which he would by law be entitled to.”
Up to the passage of this act the legal title to all the land “comprehended in said town,” except the few lots which had been effectually conveyed to purchasers, had remained in the original proprietor.— In 1799, James Taylor, the patentee, conveyed to *770 James Taylor, his son, a large portion of the land covered by his patent, the boundary of which, as described in the deed, began at the upper corner of the patent, on Licking river, and ran with the back line to certain objects called for, thence to the Ohio river, so as to include Duck creek, and to a corner described, and down the Ohio to a large poplar, mentioned as being the upper boundary of the town of Newport, on the Ohio, “and thence along the several boundaries on the land side of said town of Newport, as ascertained and established by law, and the recorded plat, &c., until the line strikes Licking river;” thence up the same to the beginning, so as to include all of the patent below the upper line of the land conveyed, “except so much as has been appropriated in manner aforesaid for the town of Newport; and also all right and title which said James Taylor, the elder, now hath, or is entitled to, or may hereafter have, or be entitled to, of, in, or to, any ferry, or ferries, from said town of Newport, and every part thereof, over and across both said Ohio and Licking rivers,” with all and singular the advantages, privileges, emoluments, See., of said land, and the ferry, or ferries, hereby granted, &c., and every part thereof. If the slip between the lots and the river was a part of the town of Newport, as established, &c., and the title remained in James Taylor, of Virginia, it would seem not to have passed by this deed, unless under the transfer of the present and future ferries, which may have been supposed to pass such title as the grantor had, and as was necessary to sustain the ferry or ferries referred to.
In 1806 an act was passed, by which, after reciting that the county courts of counties on the Ohio river had, under a previous act, granted ferries across said river — that their authority in such cases had been doubted, and that it was reasonable that the ferries so granted should be confirmed, it was enact•ed that ferries which had been granted in pursuance of the requisitions of said act, be confirmed, provid *771 ed that the grantee shall enter into bond, &c. A general authority was also conferred upon the courts of counties lying on the Ohio, to grant ferries across said river, under a restriction as to the distance between them, and a penalty was denounced against transporting persons, &c., across the river to the opposite shore, without authority, <fcc. And, in June, 1807, an order was made by the Campbell county court, which, after reciting the previous grant by the Mason county court to James Taylor, of Virginia, of ferries across the Ohio and Licking rivers, also the provisions of the act of 1806 respecting ferries which had been granted across the Ohio, and that it satisfactorily appeared that James Taylor, of Virginia, had, by deed, -&c., conveyed to James Taylor, of this (Campbell) county, a fee simple estate in said ferries then established, or to be established, in the town of Newport, thereupon grants or establishes a ferry to “said James Taylor, of Campbell county, in front of the town of Newport, across the Ohio, to the opposite shore, under the law aforesaid, and to be allowed the same rates,” &c., &c. And the grantee thereupon entered into the bond required by said act, as owner of the land.
In virtue of these grants, the ferry across the Ohio was carried on under the authority, first of James Taylor, of Virginia, and then of James Tajdor, of Campbell county, Kentucky, perhaps from the date of the original grant until the death of the last mentioned James Taylor, in 1848. It had for many years been managed and carried on by his lessees, of whom one was in possession under an unexpired lease at his death. After which, his will being for some time in dispute, a ferry bond was executed by his heirs; and upon the establishment of his will, which authorized his executor to lease the ferry, a bond was executed by the executor, and also by the lessee, Robert Air, under the requisition of the act of 1852. For many years open ferry-boats and skiffs were alone used at this ferry, as at all others in the state. In *772 the progress of time, and business, and improvement, a horse-boat was used, and then a steam-boat, and for some years past two steam-boats have been used for the transportation of persons and property by this ferry. For many years the ferry-boats and skiffs landed and received, or put off their passengers at different parts of the shore in front of Newport, according to convenience or necessity. But for many years past the landing has been generally, and almost exclusively, at the foot of York street, except that when the water has been extremely low, the boats have landed, on a bar in the bed of the river, opposite to, but at some distance from, the foot of East row (street.)
In 1830, the trustees of Newport applied to the county court of Campbell county, for the grant of another ferry from Newport, across the Ohio, and upon the refusal of their application they brought the case to this court, by which the judgment of the county court was affirmed. For the reasons of this affirmance, founded mainly upon the construction of the act of 1795 establishing the town, and of the plat therein mentioned, reference is made to the opinion of this court, as reported in 6 /. /. Marshall, 134. When this application for a ferry was rejected, the population of Newport was probably not over 1,000 souls. Afterwards, in 1850, the population having increased to some 6,000 to 8,000, and the town of Newport having been previously incorporated as a city, an application was again made by the city for the grant of a ferry, which was then granted by the county court. But the order making the grant was reversed by this court, on the single ground, that in a proceeding between substantially the same parties, about precisely the same thing, and involving the same questions of construction, without any variation of facts by which that question could be affected, the court felt itself bound by the former adjudication, and especially by the construction which had thereby been given to the act of 1795 establish *773 ingthe town of Newport. The opinion delivered in this last case is reported in 11 B. Monroe, 361.
In 1853, the steamboat Commodore, of near 200 tons, after having been duly inspected, enrolled and licensed for the coasting trade, by the proper officers of the United States for the collection district of Cincinnati, and those interested in her having obtained, for a nominal consideration, a lease from the city of Newport, of the wharf at the foot of Monmouth street, in said city, commenced carrying passengers and property, regularly and for profit, to and fro, across the Ohio river, in front of the city of Newport, the right to do so being claimed under color of the said license, and of the laws of the United States by which the licensing of steamboats is regulated and authorized. In January, 1854, James Taylor, the son and executor of James Taylor, who died in 1848, together with Robert Air, the lessee of Taylor’s ferry, obtained, upon a bill filed by them, an injunction against this proceeding on the part of the owners and managers of the Commodore, and also of the city of Newport, which they charged to be a violation of the exclusive ferry right, so long held under the laws of Kentucky, in virtue of the grants which have been stated, and which have been sance tioned and protected by the repeated decisions of this court.
The bill claims, in substance, that in making the town of Newport, James Taylor, of Virginia, retained not only the legal title to the strip of land between Front street and the river, but also all rights therein which were not incompatible with the right of common by the citizens of the town ; that the same title and rights were reserved to him by the act of 1795 establishing the town, as construed by this court ip the two cases which have been referred to, and that the same were conveyed by his deed of 1799, to James Taylor, of Kentucky, who held and claimed them until his death, since which they belong to those who are entitled to his estate ; and it is claim *774 ed, not only that the ferry right across the Ohio- river in front of Newport, which has been used and enjoyed since 1794, belongs exclusively to the devisees of said Taylor, as appurtenant to the legal ownership of the land on and adjacent to the river, but, also, that the right of wharfage was, and is, also, appurtenant to the samé estate. And upon the allegation that the city of Newport has collected and received wharfage from boats landing upon, or at, the shore in front of Newport, alledged to be the property of said estate, and to have been for more than fifty years in the use and possession of James Taylor, of Virginia, and those deriving title from him, it is asked that the city may account for and pay to said executor the wharfage so received; also, that the lease from the city to the owners of the Commodore be annulled, and that said owners be compelled to account for, and pay, the ferriages received by, or for, them, and that they, and all others, be restrained from using part of the shore in front of Newport, for receiving or disembarking persons or property ferried across the river, in either direction, and that the exclusive possession and title of the ferry, and the ferry right, in front of Newport, as held and claimed under the grants to the Taylors, be quieted.
These are in substance the claims and prayers made in the bill, which states with great minuteness and at great length, the acts and tacts supposed to constitute a valid foundation of the rights asserted. The city of Newport and the owners and managers of the Commodore, made defendants, deny the rights and resist the relief claimed by the plaintiffs. The city answering at great length, contests most of the facts and legal inferences relied on in the bill, and, going back to the origin of the town, claims that by the location and plat of the town, showing its position with respect to the river Ohio, and exhibiting an open space between the lots on the Front street and the river, and by the sale and conveyance of lots with reference to that plat, there was a dedication *775 of that space to the public uses of the town, and to all the uses appropriate to such a space, intervening between a navigable river and a town situated on its banks, and that this dedication, at first to be implied from the location of the town, and the exhibition upon the plat of a narrow open space between it and the river, without any mark or word indicating an intention of appropriating it, or any part of it, to private use, was afterwards expressly made by words, “a common,” and “the Esplanade to remain a common forever,” written on the different parts of this open space in the plat made by John Roberts, in August, 1795, under which sales were made in September of the same year. The city, therefore, claims, that although the title to said slip remained in James Taylor, of Virginia, the beneficial interest and use for all purposes to which, in its relative position to the town and the river, it was as public ground appropriated, were, by the sale and purchase of lots, in making which, they deny that there was any reservation which could affect the purchasers, irrevocably vested in those who, from time to time purchased lots or became inhabitants, and in the local and general pnblic. She maintains that the legislature could not take away these rights from the town and its citizens; that the act of December 1795 was not intended and should not be construed to have this effect, and that if it did not vest in the trustees therein named the legal title to the slip between the lots and the river, neither did it, by the reservation expressed in the seventh section, enlarge or add to the existing rights of James Taylor, nor diminish or detract from those of the town and its citizens; that in the two cases in which this court decided against the application, and the right of the town and city of Newport, the only question really presented for decision, and really decided by the court, was whether the applicant had such title or interest in the Esplanade, as entitled her, under the laws of this state, to be the grantee of a ferry across the Ohio. And *776 that her beneficial and equitable rights not having been involved in the contest for the grant of a ferry, were not the subject of decision in those, and cannot be precluded by anything which the court may have said in relation to them.
Upon these grounds, she claims that in whomsoever the legal title to the Esplanade, and the legal right to the ferry, may have been, the equitable and beneficial interest, not only in the Esplanade but in the ferry right, which was incident to it, belonged to the town and afterwards to the .city of Newport. She therefore asks for an account of the profits, as having been received in trust, and for the benefit of Newport. And also for a conveyance of the Esplanade, &c.,upon the same grounds, and upon the additional allegations and facts, that from a very short period after the organization of the town under the act of 1795, it has claimed and exercised undisputed jurisdiction over the esplanade, by extending, and at the cost of thousands of dollars, improving the streets through it down to the river; by protecting the bank from being washed away along a great part of the space in front of the town; by building and using for some years a market-house upon it; by the charge and collection of wharfage at different periods and at present, upon boats landing at the town; by the general and common use by the citizens and others, of the entire front on the river, without let or disturbance, and at their pleasure, for landing boats, for loading and unloading them, for piling and hauling away rock and lumber, and other things, they claim that the entire Esplanade, except so far as it has been used under the ferry right of Taylor, which use has for many years been almost exclusively confined to the landing at the foot of York street, has been in the exclusive possession and use of the town and the city, its inhabitants and the public, as the public ground of the town or city; that especially the landings and wharves at the foot of the several cross streets, improved under the authority and principal *777 ly at the expense of the town or the city, are public property, rightfully under the jurisdiction and control of the city, except so far as necessarily used for the purposes of the ferry; that the city, therefore, has the right to collect and receive wharfage for its own use, from boats and vessels landing at any part of the Esplanade, and especially from such as come to the improved landings and wharves; and that she had a right to make the lease of the wharf or landing at the foot of Monmouth street, to the owners of the steamer Commodore, who, as she avers, had aright, under the authority of Congress and of the license obtained by them, to use the same in carrying on the trade and navigation between the states of Ohio and Kentucky, and for the purpose of freely receiving and disembarking persons and property in the course of that trade upon and across the Ohio, the free navigation of which is secured by inviolable guarantees to all the citizens of the United States. The same right of navigating the river for the purpose of carrying on trade and commerce, between the two states upon its opposite banks, and of using the wharf or landing at Monmouth street, under the lease from the city of Newport, is asserted by the owners and managers of the Commodore.
This is the substance of the allegations and claims of the defendants, as presented in their answers to the bill. It appears, however, that after the injunction was issued and served, some change was made in the ownership of the Commodore, and under a ferry license obtained from the city authorities of Cincinnati, she was continued, or was again engaged in the business of transporting passengers and property across the river from Cincinnati to the landing at Monmouth street, in Newport, and was to some, but a more limited extent, engaged in transporting them from Newport to Cincinnati. Upon this being made to appear, a rule was made against the parties engaged, to show cause why they should not be attached for a contempt. No final disposition was *778 made of this rule. But upon the hearing, the injunction was perpetuated against the Commodore and the defendants, prohibiting them, and all persons claiming under them, from receiving at any part of the shore in front of Newport, passengers or property to be transported across the Ohio to the opposite shore, and also prohibiting them from landing in front of Newport, persons or property transported from the opposite side, and the entire privilege of ferrying across the river from both sides, was adjudged to be in the plaintiffs alone ; the claim on the one side for an account of wharfage received, and on the other for an account of the profits of the ferry, were disallowed- — -as was also the prayer of the city for a conveyance of the ferry right to her. But the master was directed to ascertain the amount of ferriages received for the transportation of persons and passengers across the river by the Commodore, and other matters pertaining to the claim on that account and the Esplanade. This last branch of the decree being interlocutory, the proceeding which it directs is not before this court for revision, though its propriety would be effected by a denial of the right which it was intended to effectuate. The defendants have appealed from so much of the decree as perpetuates the injunction and defines its extent, and as to so much as denies and dismisses the claim of the city of Newport to a conveyance of the ferry, and for an account of the profits of the ferry. And the executor of Taylor has taken a cross appeal from so much as denies and dismisses his claim to an account of wharfage received by the city.
It will be seen from the detailed statement which has been made of the pleadings in this case, and from the decree which has been appealed from, that numerous as the subordinate questions of fact and law may seem to be, they may be reduced to three principal enquiries, relating, first, to the nature and extent under the laws of Kentucky of the ferry privilege, which has been so long exercised under *779 the grants to the Taylors; second, to the nature and extent of the privilege belonging to the Commodore and her owners in virtue of the license relied on, and and to the efficacy of the license to authorize a substantial interference with the ferry privilege, as held under the laws of Kentucky; and third, to the condition in law or equity of the Esplanade and entire space between the Ohio river and the lots in Newport, as being public or private' property, and the incidental rights, public or private, which pertain to the legal or equitable property in the Esplanade, or space referred to. And under this last enquiry, will come the question as to the claim of the city to the ferry right and its profits, and as to her right to the wharves on the river front, and to wharfage, and to other uses of a public nature, in the space between the lots and the river.
1. The right of holding a ferry and its privilege of conveying passengers for toll, is a franchise in which the chancellor may protect the person in posses sion,not only by affording redress for the past, but to restrain its repeated disturbance; especially if the right has been judicially established. (9 John. Rep., 585.)
Before entering upon these enquiries, it is proper to notice two preliminary objections made to the decree, which are, that a court of equity does not, and should not take jurisdiction of this right asserted and the relief sought by the bill, and that if the court may take jurisdiction, there is a want of parties capable of sustaining the bill, and of claiming and receiving the relief prayed for. Upon the first of these objections, it is admitted that the ferry right or privilege is not only a legal but a statutory right, protected by statutory penalties. But the enforcement of these penalties is not the only remedy by which the right may be vindicated. The common law furnishes in addition, the action on the case as a universal remedy for the disturbance of franchises, of which the right of ferrying for toll is certainly one ; and it is difficult to find a good reason why this right made appurtenant to an estate in land, should be excluded from the benefit of the principle that the possession clothed with the title, may be quieted by the decree of a court of equity, against disturbance from adverse claims, or from the other principle, which, even where there has been an actual dis *780 turbance for which the law furnishes redress by way of damages for the injurious act, yet if the injury be of a continuous nature, and be committed under a claim which indicates a continuance or frequent and constant repetition of it, authorizes the interposition of a court of equitjr, not merely to redress the injury actually done, which is the only direct operation of the legal remedy, but mainly to afford the more efficacious relief of preventing the vexation and harassment of continued disturbance, to be redressed by a multiplicity of suits, and of preserving and protecting the right by restraining the commission or repetition of the threatened injury. And if in ordinary cases it be necessary to put the right in litigation at law, and to establish it there before this more effectual jurisdiction of the chancellor can be invoked, such a requisition would seem to be inapplicable where the right is already established, and in fact originated by the judicial action of a-tribunal having exclusive jurisdiction to grant the right; or, if the requisition be applicable, it would seem to have been substantially complied with, and its objects virtually attained, by defeating the repeated attempts to establish an additional ferry in opposition to the rights claimed under the grant to Taylor, the results of which attempts have in effect confirmed that grant, and effectually recognized the rights flowing from it. The nature and extent of those rights are defined by statute, and a court of equity is as competent to ascertain, and more competent to enfore and protect them than a court of law.
Other grounds besides that of furnishing a more adequate and complete remedy, and the only effectual one, might be referred to as sustaining the jurisdiction of the court of equity in this case. But whatever may be the theory on the subject, the jurisdiction in similar cases is now too well established in practice, and by reason and precedent to be successfully questioned. It is deemed sufficient to refer in support of this conclusion, to the cases of *781 Livingston vs. Van Ingen, 9 Johnson’s Reports, in which, at page 585, Kent, chief justice, lays down the position and sustained it by numerous authorities, Brittish and American, that “injunctions are always granted to secure the enjoyment of statute privileges, of which the part}r is in the actual possession, unless the right be doubtful.” And it might be added, that the question of dedication, and the conflicting claim growing out of it, have been an ordinary subject of chancery jurisdiction.
2. An executor, who by will was directed to lease out a ferry, could without uniting the heirs of the testator, maintain a petition in equity to be quieted in the enjoyment of the franchise.
Upon the objection with respect to parties, it might be sufficient to say, that we do not perceive that the objection was made in the circuit court. And according to the 123d section of the Code, it comes too late, if made for the first time in this court. But waiving this ground, we aré of opinion that although the grant of a ferry may be regarded to a certain extent as a personal trust, the right during the subsistence of the grant, is transmissible sub modo with the land itself to which it is appurtenant by descent, or devise, or sale, or lease — the consent of the county court having jurisdiction to grant the ferry, being required in case of sale or lease, and a new bond or covenant being required in all cases of a change of title, whether by act of the parties, or by operation of law. These and other regulations on the subject, not necessary to be mentioned, are contained in the Revised Statutes, relating to ferries. But by the will of James Taylor, to whom this ferry was granted in 1807, his son and executor, James Taylor, one of the plaintiffs, was authorized to rent out the ferry, and all other ferries which might be granted during his life, and to receive the proceeds, of which a part is specifically appropriated, and the residue may be subject to account; but there is no direct devise of the ferry itself, nor of the Esplanade, until his death. Such right therefore, as the testator had in the ferry, either descended to his heirs during the life of the executor, who as has been stated, executed bond in the county court, or it vested in the executor dur *782 ing his life, in virtue of the power given to him to rent it out and receive the rents, which necessarily included the power of superintending, controlling, and if necessary, even of using it, for the purpose of making the profits which were disposed of by the will, and it has been'seen thathe and his lessee executed the proper bond. If any shadow of title passed to the heirs, of whom the executor was one, they had no real interest,'but the substantial and beneficial interest during his life, vested exclusively in him as trustee for the devisees, of whom he was also one, and if he had not the legal title, he had the power to pass it, and did pass it by his lease to Air. As trustee of an express trust, he had a right to sue without uniting his cestui que trust for the preservation of the subject, and in vindication of the right from which the profits were to be derived. And although his interest as executor was for life only, while the interest, of his lessee was even more limited, we are of opinion that to the extent of these actually subsisting interests, united as they were with the possession, they as the parties whose rights and interest were directly affected by the acts committed and threatened, to the injury of the privilege which they claimed and were enjoying, had the same right to the aid of the court of equity for the protection of their interests, and to the full execution of its powers as far as necessary to that purpose, as if they, or one of them, had been possessed of the fee simple estate. They hold the possession, and are entitled to maintain their temporary right, for the benefit not only of themselves, but of those also who are to come after them, in remainder or reversion. If it were conceded that the loss or impairment of the present right claimed by the plaintiffs, the one as executor and the other as lessee, would not bar the claim to the same right by those who may become entitled in remainder, and that therefore the plaintiffs should be deemed incompetent to litigate the entire right, or to claim or have a relief com *783 mensúrate with such litigation, this concession would only limit the extent of the relief to which they might be entitled, and would not tend to a total de~ nial of all relief.
Assuming that James Taylor, the testator, was entitled to the ferry under the grant of 1807, and by his long possession afterwards, we are of opinion that his will invests his executors with the substantial rights of a tenant for life, and makes him a devisee for life in trust. He is therefore to be regarded in equity, at least, as a tenant of the free hold, having the right to defend and maintain in that character, and at least to the extent of that interest, the title of which he holds an important portion. And we may here say, that whatever doubts there might be as to the efficacy and intention of the deed of James Taylor, of Virginia, made in 1799, to convey to James Taylor, the testator, any part of the land lying between the lots in the town of Newport and the Ohio river, which is represented in both of the plats, and regarded in the act of 1795, and recognized in the opinion of this court, reported in 6 J. J. Marshall, supra, as a part of the town, there is no doubt of the intention of the grantor to convey the entire ferry right, present and future, from the shore in front of the town, -and from all parts of it. And whether this could or could not have been legally and effectually done, without conveying to the grantee the title to the soil itself, or some part of it, the grantee of that deed, used and held the existing ferry under it until 1807, when the court which had jurisdiction, considering him as having been invested by the deed with the ferry right which had been .granted to his father, and as being therefore entitled to the benefit of the act of 1806, in confirmation of previous grants, established the same ferry in his name, by an order which was in effect a new grant of the privilege to him; and the same ferry has been continually used by him, or under his authority, from that day to this. The transfer of the then existing *784 ferry privilege, and the subsequent renewal of the grant on thé basis of that transfer, sanctioned as they are by 'a possession of fifty years, cannot now be questioned. And the ferry privilege, or right, as it has been used under the grants above mentioned, and with such rights as pertain to it by law, must be regarded as having been indisputably vested in the testator at his death, and as having passed by Ijiis will under such restriction, already referred to, as the law imposed.
3. The laws of Kentucky only profess to grant the privilege to ferry keepers, to convey passengers &c. to the opposite side of the Ohio river; and the same power and right is accorded to Ohio State, and to land at any public landing or wharf, or on private property, by leave to do so.
We come, then, to the first principal inquiry, what is the nature and extent, under the laws of Kentucky, of the privilege conferred by a grant of the ferry right across the Ohio river, by a county court having jurisdiction to grant it? And in answering this inquiry, we observe that the laws of Kentucky do not profess either to grant, or to secure or protect, the right of ferrying across the Ohio river, except from this to the opposite shore; nor do we find that there has been any attempt, by statute, to regulate or interfere with the transportation from the other side to this, under authority derived from the laws and government on the opposite side. But the right of any state or territory to grant, within its jurisdiction, the right of ferrying across the Ohio, has been uniformly recognized and respected, and, so far as we can discover, never denied. It will be recollected, that in the order of January, 1794, which granted to James Taylor, of Virginia, the first ferry from the town of Newport, he is authorized to charge the same fare that is allowed from the other side. This implies that there was, even then, a ferry from the other side, which, however, does not otherwise appear. It seems, however, that at different times since 1807, and while Taylor’s ferry was in operation, there had been ferries from the other side, which were carried on for short periods, but of which none, so far as appears, was obstructed in bringing passengers, &c., &c., from the other side.
*785 The preamble of the act of 1806, under which tbe grant of 1807 was made to James Taylor, of Campbell county,recites, “that the county courts of several counties on the Ohio river had granted ferries across said river to the opposite shore. The first section of the act provides that the bond to be given, on confirming súch grant, shall express in its condition, that whereas a ferry hath been established from the land of said--, across the Ohio river, to the opposite shore,” &c, The third section authorizes the several' county courts aforesaid, (that is, of counties on the Ohio,) to establish ferries across said river, to the opposite shore. And the seventh section denounces a penalty against any person not authorized by said county courts, or by this act, who shall transport passengers or property across said river, to the opposite shore. This act of 1806, provided that no ferry should be established on the Ohio, within one mile above or below an established ferry, unless it be in a town, or rendered necessary by an impassable creek, orée opposite to some established jerry in the Ohio state. Ah act of 1812 denounces a penalty upon any citizen oj' Kentucky who, without authority from the laws of this state, or of the state or territory opposite to an established ferry, shall transport passengers or property across the Ohio river, from the opposite shore to the Kentucky shore, within one mile in a straight line, above or below an established ferry, for any reward, or promise thereof. The act of 1836, which is confined in its operation to the county of Jefferson, imposes a penalty upon the owners, &c., of ferries established from the opposite side of the Ohio, and not having the grant of a ferry from the Kentucky side, for transporting, without arrangement with the owner of the ferry on this side, and to its prejudice, any person, or thing, with or without charge, from the Kentucky shore to the opposite side of the river. And the Revised Statutes, Title, Ferries, section 14, page 360, adopted in 1852, denounces a penalty against any one who shall, for reward, transport any person, or *786 thing, across a water-course, from or to a point within one mile of an established ferry, unless it be the own-gr 0† an gstablished ferry on the other side of the Ohio or Mississippi river, so transporting to such point on this side; and also against any owner (his lessee or servant,) of a ferry on the other side of either of those rivers, who shall so transport from this side without reward.
These statutes, and among them the Revised Statutes, which, as we suppose, contains the present law upon the entire subject, sustain fully the proposition first laid down in this part of the case, and establish the fact that Kentucky has never claimed the exclusive right of ferriage across the Ohio river except from this shore, and while she has interdicted the establishment of ferries from this side, within a certain distance of an established ferry on this side, she has constantly recognized the right of the authorities on the other side, to establish ferries from that side, without regard to the interdict. The Revised Statutes prohibits the transportation for reward ■across thé river to or from either shore, within one mile of an established ferry on this side, unless by a ferry established on the other, which may transport to this side, and prohibits such transportation (within the interdicted distance,) from this side without reward, even by a ferry established on the other side. The opposite ferry is thus prohibited from taking ‘passengers, &c., from this side within one mile of an established ferry, whether with or without reward, and all others are prohibited from either taking from this side, or landing upon it, at any point within the interdicted distance, persons or property transported or to be transported for reward across the river. To this extent the state claims jurisdiction, for the protection and preservation of her own established ferries, and by virtue of her sovereignty over her own territory, on' which, in the cases prohibited, persons and property must be landed from, or received for transportation across the river. The *787 exclusive privilege granted to ferries established under the authority of this state, does not exceed the right thus claimed by the state, but is more restricted since it is subject to diminution by the establishment •of ferries within the distance of one mile and á half on the Ohio river, in a town or ci;y, or if an impassable stream intervenes* The right thus claimed by the state over its own territory on the river, and for the protection and benefit of its own grantees of the ferry privilege, it has not at any time denied to the states on the other side. Nor do we perceive that in any of the statutes which have been passed for the general regulation of ferries, and of the ferry right, she has overstepped the limits of that concurrent jurisdiction over the Ohio, which, by the 11th section of the compact with Virginia, is conceded to be in the states which possess the opposite shore of that river. Some comment was made by this court upon the effect of this concurrence of jurisdiction, in the case of Arnold, &c. vs. Shields, 5 Dana, 22, which arose under the act of 1830, above noticed. It was then said that this concurrence oí jurisdiction gave or implied equal power over the common river, in the states on the opposite side, and that neither of the states referred to, could, consistently with the compact, exercise any authority over it, which would destroy, impair, or obstruct the concurrent rights of the other. If this be the true exposition of this provision of the compact, and it is certainly not too restricted, it has not been violated by the ferry laws of Kentucky, which concedes to the states on the opposite shore of the Ohio, the same rights on this subject which she exercises herself. As they make no discrimination in favor of the citizens of Kentucky, when not acting under authority derived from her, over those of other states acting without the sanction of public authority, derived from them, the inhibitions and penalties of these laws, must be regarded as the exercise, in good faith, of the undoubted right and duty of the states, as well on this as on the other *788 side of the river flowing between them, to provide for and secure for common use, upon their respective sides, suitable means for the safe and speedy passage of persons and property across the river to the opposite shore. And if it be conceded that this common right and duty of the states on each side, gives no right to land the vessel used for transportation from the one side, upon the private property of individuals on the other, without their consent, it must also be conceded that the authorized vessel used for transportation from either side, may use for landing on the other, its freight, or persons, or things, either private property with the consent of the owner, or the public highways coming to J the watei’’s edge, or, subject to suitable charges, and at any rate by consent, the public wharves or other accommodations furnished on the shore for embarking and disembarking persons and property. These rights, existing on the side of the river opposite to that on which the right of transportation from its own shore is granted, do not imply nor flow from any authority in the state which grants the privilege of transportation from its own side, but which has no power or jurisdiction on the other. They are the individual rights of all persons to pass to and fro across the river; and whatever right may be supposed to pertain to the vessel itself, in the state opposite to that in which it was licensed, is derived not from the license nor from the authority which grants it, but from the rights of individuals of which it is the instrument. These rights of ingress and transit, dependent among nations absolutely sovereign, upon the general principles of international comity, or an agreement, and ultimately upon the will of each, so far as its own territory is concerned, have, unquestionably, a firmer foundation in the principles and provisions of the constitution, which establishes the union of the states, and secures the free and peaceful intercourse of their respective citizens. It is not inconsistent with these principles and provisions, nor with the rights they *789 intend to secure, but is on. the contrary, essential to the enjoyment of these rights, that the states bordering on a navigable river which flows between them, should possess and exercise the right of granting and controlling the privilege of ferrying from their respective shores, with such restrictions as to competition, as may be deemed necessary to secure the proper accommodations for travel and trade, and with such regulations as will secure a speedy and comfortable passage across the river; and which is more important to each or every state, separately considered, with such regulations and restrictions as may be necessary for the preservation of the property and rights of its own citizens, as to which none can be expected to judge so well as the .state herself, and for which so long as she violates no right of others, none can better provide.— The public highways and thoroughfares extending to the rivers are the best indications of the places where transportation across them from either side is required for the public accommodation; and if free ingress is allowed at these points to all who, under the just exercise by the state of its essential conservative power, have a right to enter upon or depart from its territory, there can be no complaint of an excess of its own jurisdiction, or of an invasion of the rights of others. Nor is the restriction of the transportation across the Ohio river to the established ferries for one mile above and below those established on this side, and the exclusive privilege within that distance, secured to our ferries, for the transportation from this side, an infringement of the right to the free navigation of the Ohio river, secured to all the citizens of the United States. The primary object of that guarantee was to secure to the citizens of all the states, the right of navigation to and fro along the stream, for the purposes of trade and intercourse, and free from obstruction or impediment by the laws, or under the authority of any of the states along whose borders they might pass. But it could not *790 have been intended to deny, and does not necessarily or fairly import a denial or impairment of the territorial rights and sovereignty of the states over their own soil adjacent to the river, further, at any rate, than in particular cases may be necessary to-the use and enjoyment of the right of vavigation itself. And if the right of crossing the river from shore to shore be included in the guarantee, still, as the establishment of ferries at convenient distances, and the regulation of them, with a view to insuring a safe and speedy passage from hank to bank, is absolutely essential to the effectual and beneficial enjoyment o.f the right by all, the exclusion of unauthorized competition, being a necessary means-of keeping up for general accommodation, the established ferries, so far from being an interference with the free passage across, of those who desire to pass, is the best and only certain provision for the passage of those who are not themselves provided with the means of crossing. And we do not understand that persons residing on the river are prohibited from transporting themselves across it, by such means of their own as they are provided with. The exclusive ferry privilege, as it exists under our laws, having been thus minutely considered and defined, and the right of the state, as heretofore exercised, to grant and regulate it, having been shown not to be inconsistent with the just rights of others, but to bo but the exercise of its duties in aid of the rights of individuals, it only remains to say, under this branch of the subject, that while the laws have, for the benefit of the public, given to the owners of established ferries, some exclusive privileges, they have also, for thehenefit and security of the traveling and trading public, imposed upon them onerous duties, requiring them to furnish not only suitable- boats for transportation of persons and property with comfort and safety, and to give them immediate passage across the-river, and at rates fixed from time to time by the-county court, hut also to provide suitable accomma *791 dations for reaching and leaving the boats, and as a measure of safety found necessary in the course of events, they are prohibited from carrying slaves across the river without the consent of their owners. Their duties in all of these particulars, are secured by bonds, to be renewed at short periods, by liability to damages, for injuries caused by neglect or breach of duty, by penalties, amounting in some cases, to a forfeiture of their privileges, and by a constant subjection to the supervision and control of the court of the county within which they are situated. They are, indeed, agents of the public, invested with important rights, as the consideration and means of performing important duties with which they are charged, and for the due performance of which, they are held to a strict scrutiny and a heavy responsibility.
We think it manifest from what has been said, and there are other considerations tending to the same conclusion, that the privilege of ferrying for toll, and especially of ferrying across the Ohio river, which runs between this and other states, is a privilege grantable only by the public, and to be exercised under such regulations as the public may deem requisite for the safety, comfort, and convenience of all concerned; and that it is no less the duty, than the right, of the government which has jurisdiction over ferries, to exercise it with a view to the attainment of these ends. And this brings us to our second inquiry, which is, in substance, whether the license of the Commodore, under the laws of the United States, conferred on her, or her owners, the privilege of transporting persons and property, to and fro, across the Ohio river, between Newport and Cincinnati. If this occupation was not, as it most clearly was, an exercise, or attempted exercise, of the right of ferrying, for toll, across the river, it was a manifest violation of the statutes of Kentucky, unless the license be deemed equivalent to the grant of the ferry privilege from both sides oí the river. But *792 the Commodore was, in fact, engaged in the regular business of ferrying from shore to shore, under color of a license for carrying on the coasting trade. And it is contended that the power of congress to regulate commerce among the states, includes the power to regulate the navigation, and the vessels by which that commerce is carried on ; that congress, under this power, having many years ago (in 1793) enacted regulations for vessels engaged in this trade, and provided for the inspection, enrollment and licensing of such as were adapted to it, whereby they were authorized to enter any ports of the United States, and land at any public places, for purposes of trade, the subsequent act of 1838, “to provide for the better security of the lives of passengers in vessels propelled by steam,” requiring all such vessels to be inspected, enrolled and licensed under the authority of the United States, and prohibiting any, without such license, to transport passengers, or goods, on the lakes, bays, rivers, and other navigable waters of the United States; the license obtained under this act gave a similar right to the Commodore, and her own'ers, and especially when engaged in carrying on commerce between the states, to enter any ports, or open and public places, in the course of trade, and to receive and put out on the public wharves, and to transport on the Ohio river, to or from any port or place in Kentucky, to or from any port or place in Ohio, passengers and freight, constituting a part of the commerce between those states, of which a large amount passes, or is carried, on, between Newport and Cincinnati.
If, by the operation of this act, every steamboat wdiich receives the license provided for, is thereby authorized to transport persons and property across the Ohio, or any other navigable river, from bank to bank, or from state to state, situated upon the opposite banks, the power of the states to establish and regulate ferries, and to give them the protection required for their beneficial operation, is in effect nul *793 lifted, or may at least be overborne and disregarded at the pleasure of every owner of a licensed steamboat who may choose to exercise the privilege of ferrying in contempt of that power. If the power may be thus set at defiance with impunity, it is, in effect, no power. Its existence is but a name — its attempted exercise a mockery, a delusive promise, without the power of performance.
If it were conceded that the commercial power vested by the constitution in the congress of the United States, might be legitimately exercised in the regulation of ferries transporting persons and commodities across a river flowing between two states, and that where there is a conflict between the regulations enacted by congress, and those of the states, on the same subject, the latter must, under the mandate of the constitution, yield to the former; still, a power of this character, so long exercised without question, not only by this state, but by every other state similarly situated — a power essentially local, and in its immediate operation affecting local interests only — dependent for its judicious exercise upon local knowledge — founded on the jurisdiction and power of the state over its own soil, and the persons and property of its inhabitants, and necessary for the proper exercise of its rights and duties for the protection of its citizens and their property, as well as for the safety and convenience of others passing to and from its territory — a power of this character, whose existence, as a remnant of sovereignty left in the states, is thus sanctioned by time, thus approved-by considerations of fitness, and thus demonstrated by necessity, is entitled to too much respect to be defeated by anything less than an unequivocal assertion, either express or by necessary implication, of the conflicting power, or to any greater extent than such conflicting power is exerted under the clear sanction of the constitution.
If the commercial power vested in congress may be exercised upon every subject, the regulation of *794 which may more or less remotely affect the commerce between or among the states, which we do not admit, it would not follow, and cannot be admitted, that the mere existence of such a power granted, if granted at all, only for the general good of all, and for the promotion of harmony, and the maintenance of union among the states, should have the effect of depriving the states of all power of making any regulation which may remotely or incidentally affect that commerce. And the conclusion which, as it seems to us, is at once most consistent with the admitted supremacy of the constitution, and the constitutional acts of congress, and with the constitutional independence and sovereignty of the states, is, that there are some subjects which,* although the regulation of them may incidentally affect commerce between or among the states, are either wholly excluded from the commercial power of congress, or are open to the legislation of the states until congress legislates upon them, and so far as it does not so legislate; and there may be different subjects coming under both classes. The proposition that the power of congress extends to all subjects, the regulation of which may, however remotely, affect commerce among the states, and that the mere grant of the power, though, not exercised, is a prohibition of its exercise by the states, is inconsistent with the essential rights of self-government and self-preservation which never were, and, so long as they retain a vestige of independence, never can, be yielded by the states. It may be admitted that the states have not the power to regulate the commerce between them, and yet be true that they have other powers, the exercise of which may incidentally affect that commerce; and the constitutionality of such an exercise of an admitted power, not directed to the regulation of commerce, butto the regulation of other subjects, or objects, within the jurisdiction and power of the state', cannot be questioned, and certainly cannot be denied, unless it come in conflict with some regulation *795 made by congress, in the legitimate exercise of its constitutional power to regulate this commerce.
This, as we understand the case of Gibbons vs. Ogden, 9 Wheaton, p. 1, and 5 Condensed Reports, 563, is the doctrine, express and implied, of the opinion of the supreme court of the United States delivered in that case, by the chief justice; and with some differences of opinion among the successive judges of that court as to the extent of the power granted to congress to regulate commerce, and as to the question whether, and how far the grant is exclusive, the same doctrine has been substantially maintained to the present time. In the first place, it is conceded in that opinion that the power of taxation necessarily remaining in the stptes, is shown by the restriction upon it in the second clause of the tenth section of the constitution, to have included, in the opinion of the convention, the power of laying duties on imports and exports, and tonnage duties, although they operate upon commerce. And again, in speaking of inspection laws, which are also recognized by the same clause as being within the power of the states, and which are admitted to have a remote and considerable influence on commerce, though not derived from the power to regulate it, the chief justice says : “They form a portion of that immense mass of legislation, which embraces everything within the territory of a state, not surrendered to the general government, all which can be most advantageously exercised by the states themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of the state, and those which respect turnpike roads, ferries, &c., are component parts of this mass.” And he proceeds to say: “No direct general power over these objects is granted to congress, and consequently they remain subject to state legislation. If the legislative power of the union can reach them, it must be for national purposes, it must be where the power is expressly given for a special purpose, or is clearly incidental to some *796 power expressly given.” The proposition is then advanced, that although the power to enact quarantine and health laws for the proper object, be in the states, such laws may be controlled by congress so far as it maybe necessary to control them, for the regulation of commerce. And so, while the regulation of pilots is said to be within the power to regulate commerce, conferred upon congress, it is also admitted that the acknowledged power of a.state to regulate its police, its domestic trade, and to govern its own citizens, may enable it to legislate on this subject to a considerable extent. And in a previous part of the opinion, a general principle of discrimination between the powers conferred upon the government of the union, and those retained by the states, is stated in the following terms: “The genius and character of the whole government seem to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally; but not to those which are completely within .a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of exercising some of the general powers of the government.” And upon the question whether the power of congress to regulate commerce among the states, stops at the jurisdictional lines of the several states, he asks the significant question, “Can a trading expedition between two adjoining states, commence and terminate outside of each?”
From these general propositions, which, without going into the details of the subject, yet cover the whole ground, it is clearly deducible, that although the commercial power granted to congress may have been considered as embracing the entire subject, and every part of the subject, of commerce between or among the states, there yet remained in the states power over many subjects connected with that commerce, and the regulation of which, by the states, though it might incidentally, and in a greater or less degree, affect that commerce, must prevail until con *797 gress, under its comprehensive power, to be exertfed for national purposes, should make a different regulation of the same subject. Without attempting to trace these principles through the various decisions of the supreme court, in which they have been involved, it is deemed sufficient to notice two only, viz : that of Wilson vs. The Blackbird Creek Marsh Company, 2 Peters, 250, and that of Cooley vs. The Board of Wardens of Philadelphia, 12 Howard, 311, decided in 1851. In the first of these cases the question was, whether an act of the state of Delaware, authorizing the construction of a dam across Blackbird creek, was constitutional. The tide had ebbed and flowed in the creek higher up than the place where the dam was erected. The dam stopped a navigable creek, and abridged the rights of those who had been accustomed to use it. But the court uses the following language : “The value of the property on its banks must be improved by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come in collision with the powers of the general government, are undoubtedly within those which are reserved to the states.” And while it is said' that if congress had passed any act in execution of its power to regulate commerce, the object of which was to control state •legislation over these small navigable creeks, the ■state law conflicting with it would be void, it was decided that, as congress had passed no such law, its power to regulate commerce had not been so exercised as to affect the question of the repugnancy of the law of Delaware to the power of regulating commerce conferred by the constitution.
4. The power of Congress to regulate commerce between the States, does not interfere with the right of the States to leg islate on questions which concern its own par ticular interests and those of its ferries?’ where Congress has not legislated. (13 How«rá, 318.)
*797 In the other case referred to, (12 Howard, 318,) the question whether the grant to congress of the power to regulate commerce, did, per se', deprive the states of all power to regulate pilots, is expressly discussed and decided. And on the ground that it is not the mere existence of the power over commerce, but its exercise by congress, which may be incompatible with *798 the exercise of the same power by the states, which, therefore, may legislate in the absence of congressi°na^ regulations, and on the ground that this power embraced not only a vast number, but a great variéty of subjects, some requiring a uniform rule, and others, like that of pilots, demanding a diversity of. . . . „ regulation, to meet the local necessities ot navigation; and in view of the legislation of congress on the particular subject, it was decided by a majority of the court, 1st. That the mere grant of the commercial power to congress, did not deprive the states of the power to regulate pilots; and, 2d. That, although congress had legislated upon the subject, its legislation manifests the intention, with a single exception, not to regulate this subject, but to leave its regulation to the several states.
5. The power regulate ferries? and grant ferry thelr^own cití zens, where stream divides no? be questioned; at feast unshall legislate afa^questíon'°"
If, then, it be true, that the power of congress to regulate commerce among the states, may extend to ^13 regulation of Ferries from the state on one side, to that on the other side of an intervening river, and that the conflicting state laws must yield to such an exercise of the power, it must be admitted that the subject is obviously and peculiarly one of that character which demands such regulation as will meet the local necessities qnd convenience. And that whether tested by the principle of the case referred to *n ^ Peters, or of that in 1'Mh Howard, or by the more general principles of the case of Gibbons vs. Ogden, it is one of those subjects over which the power of the'states, exercised, as it has been, from the beginning, must prevail until the subject is regulated by congress, and except so far as it is so regulated. If the subject of ferries be, to any extent, embraced in the power granted to congress, as to which we do not in this case deem it necessary to inquire, it is certainly one of those contemplated by the opinion of the court in the case of Gibbons vs. Ogden, which can be most advantageously regulated by the states, and over which, no direct power being conferred by congress, if the legislative power of the union can reach *799 them at all, it can only be for national purposes, and under a power expressly given for a particular purpose, or clearly incidental to some power expressly given.
6. The act of Congressof 1793 and 1838, or 1852, requiring steamboats to obtain license, &c., does not ap ply to ferry boats. No intention hasbeen manifested by Congress to assume the control of ferries, or the legislation of the States on that subject.
Then the real question in this part of the case is, whether Congress has, to any extent, regulated ferries across the Ohio or any other river, from state to state, and how far, if to any extent, it has regulated or attempted to regulate them ? The' act of 1838, above referred to, is in its descriptive terms of the vessels to which its requisitions of a license and its penalty for navigating without one, apply sufficiently comprehensive to embrace all vessels propelled by steam. But the requisition of the first section, that the owners shall make a new enrollment of the same, under the existing laws, and take out a license, under the conditions now imposed by law, and which shall be imposed by the act itself, seem to imply, that only such vessels as might be required to be enrolled under previous laws, were intended to be embraced in the act. And on this ground, and because the requisitions of the previous laws, referred to, and especially of the. act of 1793, were not deemed applicable to ferry boats, making many trips each day, across a narrow river, Judge Catron, a judge of the supreme court, presiding in the circuit court for Kentucky, in an opinion, of which a manuscript copy is before us, decided that a steam ferry-boat, used for ferrying across the Ohio river, was not intended to be embraced by the act, and that the penalty which it imposes for not having obtained a license, could not be enforced against the owners of such boat. It may be added, as confirmatory of this view of the act of 1838, that some of its own provisions for the safety oí passengers, would seem to be applicable to longer voyages, and scarcely necessary in reference to the short and frequent trips of a ferry-boat. The title of the act also indicates what is notorious in the history of the times, that this action of Congress embracing steam vessels navigating *800 our western rivers, was especially induced by the many disasters, involving to a frightful extent the loss of life or limb, which had occurred in the longer voyages up and down the rivers, and it was to afford better security against such disasters, arising as they did, from the insufficiency of the boat, or its engine, or equipments and officers, that the inspection, enrollment, and licensing of steam vessels were required, and other provisions made, for the same purpose.
But if it were conceded that this act, so far as it provides for the safety of passengers, from the dangers of steam, and of fire necessary for its generation, should be deemed applicable to all steamboats, wdiether used for ferrying or for other purposes, it would not follow that Congress intended by this act, to assume the general regulation of ferries, transporting persons and property from state to state, or to regulate their establishment and rights or duties, or to interfere with those already established by the states, any further than to require the inspection, enrollment, and license for which it provides. To say nothing else, the absence of all provision for securing the speedy and regular transportation of persons and property across any river, and for meeting the requirements of travel and trade, in passing from one to the other side, shows conclusively that Congress did not intend, in passing this act, to assume the office of regulating ferries, which had so long been safely and beneficially exercised by the states. If the license required by this act authorizes the owners of the licensed boat to transport persons and property across a river, whenever and wherever, and on such terms as they choose, it authorizes them to violate the rights of individuals; to invade and contemn the jurisdiction and power of the state, and to destroy or impair the efficacy of establishments created and made suitable to meet the exigencies of trade and intercourse between the states, without imposing the plainest and most essential requisitions *801 for carrying on that commerce, under color of regulating which, the authority must be supposed to have been granted. We cannot concede that any such authority was intended to be given, nor can we concede that if given in the manner and under the circumstances stated, it would be valid for the purposes claimed.
7. A steam ferry boa,t acting under a license obtained under the act of Congress on this sub ject,hadno right in virtue of such license, to interfere with the ferry privileges of the appellees, held under the State authority.
Butin addition to the considerations-just mentioned, and to others before noticed, which must have an important bearing, not only upon the question of the extent of the power conferred on Congress, or remaining in the states, but also upon the construction of the acts of Congress in the execution of its power, the act of 1852, entitled, “an act to amend an act, entitled, an act to provide for the better security of the lives of passengers, on board of vessels propelled by steam, and for other purposes,” affords, as we think, conclusive confirmation, if confirmation were necessary, of the opinion that the act of 1838, so far from being intended to regulate ferries, or to authorize any interference with them, under color of the license which it provides for, was, probably, not even intended to apply to steamboats engaged in the business of ferrying. The act of 1852 embraces in substance, the provisions of the previous act, with additional details and requisitions, carried out with great minuteness and precision, and enforced by numerous penalties. It commences by declaring that no license or enrollment shall be granted, under this or the former act, to any vessel propelled, &c., until satisfactory evidence shall be produced, that all the provisions of this act have been complied with; and for non-compliance, the owners and vessel are subjected to the penalties contained in the second section of the former act. As the provisions of this act seem to continue and extend, or enlarge all the provisions of the act of 1838, there seems to be no part of that left in actual force and operation. Then the 42d section of this act of 1852, expressly declares that it shall not apply to steamers used as. ferry-boats. *802 And the 44th section expressly repeals all parts of laws therefore made, which are suspended by, or are inconsistent with this act. This act, then, which covei’s the whole subject, referring only to the penalties of the act of 1838, for non-compliance with the provisions of the act of 1852, is considered as super-ceding and in effect repealing the act of 1838. And if it is not to have this technical effect, it shows, at lea«t, when taken, as it should be, in connection with the previous act, that it was not intended that either should apply to steamers used as ferry-boats. And the fact that in 1838, steam ferries were little used, may account for the failure to exclude them from that act. It was certainly not intended by the last act, that any steamer should be licensed merely upon compliance with the provisions of the first, for this would be directly inconsistent with the first section. And as the last act does not apply to steam ferry-boats, there is no authority for licensing such a vessel under either act. It would be very strange, then, and as we think, inadmissible, to suppose that while no license can be granted to a steam ferryboat, under the law's relating particularly to vessels propelled by steam, such a license could be granted under laws for regulating the coasting trade, passed before steam vessels were in use, and which, at any rate, make no particular reference to them. The act of 1838 requires a new enrollment of steam vessels, under then existing law's, and a new license under the conditions imposed by those laws, and by that act. The act of 1852 prohibits any enrollment or license of steam vessels, but upon terms prescribed by that act, which terms had not been required by any previous act, and do not apply to steam ferryboats. The Commodore' appears to have been inspected, enrolled, and licensed in 1854. Whether her owners complied wfith the act of 1852, it is not deemed material to inquire. If they did not, we suppose her license, being obtained in violation of law, is of no avail. If they did, her license to be *803 employed in carrying on the coasting trade, unde” the laws regulating that trade, which, so far as we can discover, never have been understood to confer the right, ferrying, properly so called, did not, in our opinion, confer upon her or her owners the right of transporting persons and property, as a ferry-boat, between Newport and Cincinnati, to the disturbance of the ferry established' there, and- to the injury of those entitled to it.
t 8. Apian of a town laid out up on a navigable ”™re’ g^ownup^ on the plat be- and the river,indlcatl.nS lts aP' propriation to public use; and ^i(1g,!e sach°a plat, are tireumthe absence of ovideneedwhioh show a dedicagp°anoe to puWie "3e- TI;(d1Sli the establishmentbytheprory^'upo'n a that space would be show a reservaj^thíexteñt^f the unintemiptR^for^at^ur* Pose- And after-an acquiescence in such claim ^irt™years!can not be questioued. (8B.Mon-r0c,258.)
This opinion having been already extended to an ,-f , . ....... , , . . Unusual length, we shall limit our third inquiry to as brief a space as practicable. The facts relating to the Esplanade and the entire space between the lots in the town of Newport and the Ohio river, have been substantially presented in our preliminary , , r f , statement, and in the statement made of the claims •and pleadings of the parties. The location of the town, the plat made in 1791 or 1792, presenting an open space between the front street and the river, and the re-survey and new plat made in August, 1795, having words written on the open space, indite at in g its appropriation to the public, together with "the sales of lots made under both, before the passage , r ° of the act of 1795, are circumstances which, according to the repeated decisions of this court, would, in the absence of proof to the contrary, suffice to establish a valid dedication of that space, for all the publicuses to which it was appropriate. The reasons given by Hubbard Taylor, the agent of the proprietor, for not laying out that space into streets and alleys, not having been, so far as appears, communi- . , , .7 , , „ , , . cated to the public, or to the purchasers or lots, could not repel the presumptions arising on the face of the plat. And although, before the second plat was r , , A ,,. , „ . , . , L . made, the established ferry might be sufficient to show that the right of ferry was intended to be reserved, there was nothing on that plat to show that anything else was reserved. The claim of the ferry right from the time of its establishment, may have feeetifacquiesced in by the few persons interested, in. *804 consideration of the advantage of having a ferry, to which no other individual but the original proprietor was entitled. The ferry right was, doubtless, the principal object of the reservation, made in the 7th section of the act of 1795. And although there may have been no precise notion on any side, of the uses of the space next to the river, declared to be for a common, the visible ferry carried on by the proprietor, must have apprized all concerned, that the ferry right was intended to be reserved. The acquiescence in the. act thus understood, and in the right of ferrying claimed and exercised under it, is sufficient, not only to establish the presumption of consent at the time, and perhaps of an original reservation, but to establish the right itself, as against the town. And as during the entire period, the ferry has been carried on by the Taylors, under claim of title, for their own .exclusive profit, without the recognition of any right or interest in the town, to the proceeds or any share of them, and, so far as appears, without even a claim of that sort on the part of the town, we are of opinion, that by the lapse of time alone, if there be no other ground, all claim on the part of the city of Newport, not only to the legal right to the existing ferry, but to the beneficial interest in its proceeds and profits, is barred and extinguished, if it ever existed'-
9. The dedication of land by a proprietor, of lands laid out as a town, on a navigable river, to be a common, confers the right on the public authorities of thetownto build wharfs and charge wharf-age.
With respect to the title and uses of the Esplanade and entire river front, we should be inclined to the opinion, if it were not for the former decisions on the question, between the same parties or their predecessors, in whose place they stand, that the legal title was vested by the act of 1795, in the trustees, for the general uses of the town and the public, except as to the ferry. But this court having given a different construction to the act, in the first contest between Taylor and the town of Newport; and in the renewed contest of 1850, the court, though dif-. ferently constituted, having regarded that construction as binding upon it, we should not feel at liberty, *805 upon the same question between the same parties, to depart from a construction thus doubly sanctioned, nor should we do so upon any question to which it was directly applicable, but upon grounds of absolute certainty and conviction. It will be recollected, however, that in the cases referred to, nothing was in contest but the right of ferry, and that which was essential to it, and the only point really decided, was, that the town and city of Newport had no such title or interest in the open slip on the river, as carried with it the right of ferry, or authorized the grant of a ferry to her. The question, whether the legal title was in the town or in Taylor, may have been neces sarily decided. But the question, what other rights, exclusive of the legal title and of the right of ferry, the town and city were entitled to, either under the original dedication, or under the declaration made in the 7th section of the act of 1795, was not before the court for decision, nor necessary to the determination of any point actually presented. The court, it is true, in the first of the cases referred to, not only decided that the title to the slip in question, was not in the town or its trustees, and consequently remained in Taylor, and that the right of ferry from the town, was reserved to Taylor by the act, and that the title and ferry right had .passed to James Taylor of Kentucky ; but also restricted the rights of the town in the open slip on the river, to a mere light of common, which, though not defined, is understood to have been used in its technical sense, and declared that the reservation to Taylor included all rights not incompatible with the right of common, spoken of in the opinion, as the commonable right of the town. But the only question was, whether the town had such right or interest in the land, as was requisite to entitle it to the grant of a ferry. And the conclusive adjudication, that such right was not in the town, but was reserved to Taylor, might still leave in the town all other rights and uses, not incompatible with the reservation of the right of ferry in front of the town, *806 and which might still be properly claimed, under the dedication of the slip, whether by the plat or by-statute, as a common for the town.
It was decided, in the case of Rowan’s executor vs. Portland, 8 B. Monroe, 258, that the ferry right which in that case had been granted to the proprietor of the town, and was in use before the dedication, though attached to a portion of the slip which had been dedicated, was not essential to the public uses of the dedication, and did not necessarily pass, by implication, as a part of it, but was impliedly reserved to the proprietor. And yet, in that cáse all other appropriate uses of the slip, for the purposes of the town and the public, and among them the right of constructing wharves and charging wharfage, were decided to have passed by the dedication. The right of ferry from the slip now in question, or from any convenient part of it, might have been reserved to Taylor, and yet all other rights and uses, not inconsistent with, nor necessary to sustain it, might have been dedicated, either by the plat and sale of lots, or by the statute establishing the town. In the original plat, the dedication was not indicated, and therefore neither restricted nor enlarged, by any written word. The second plat, and the statute founded on and referring to it, calls it a common, or an Esplanade, to remain a common forever. Was the Esplanade to be a common of pasture, a common of piscary, or a common of turbary? Was the Esplanade, one-half of which, or more, was the sterile shore and bank of the river, dedicated forever to this restricted use of a town situated on the bank of a noble river, and seeking and expecting the advantages of that situation? And was not the word “common” understood, and to be understood, not in its technical sense, as being a right or profit which one man may have in the land of another, but in its popular sense, “as a piece of ground left open for common and public use, for the convenience and accommodation of the inhabitants of the town. It was *807 understood in this latter sense by the supreme court of the United States, in the case of Cincinnati vs. White’s lessee, 6 Peters, 435, and by this court, in the ease before referred to, of Rowan’s executor vs. Portland, and in Giltner vs. Trustees of Carrollton, 7 Ben. Monroe, 680, and Kennedy’s heirs vs. Covington, 8 Dana, 61. In which cases, and in others referred to therein, and in Fox vs. Town of Dover, 9 B. Monroe, 200, and Alves vs. Town of Henderson, decided at the last term, the doctrine generally applied by this court to the question of dedication in the establishment of towns, is to be found. Then not feeling ourselves bound by the interpretation heretofore given by this court to the word “common,” as used in the plat, and in the act of 1795, except so far as that interpretation may be necessary to explain or to sustain the decision as to the ferry right, we are of opinion that the dedication of the slip of ground in question, as a common, by the plat of 1795, and by the act establishing the town, was a dedication of it as public ground, for the convenience and accommodation of the town and the public, and for such appropriate uses, exclusive of the ferry right in Taylor, and not inconsistent with it, as are to be implied in the dedication of a narrow slip of open ground between the lots and a navigable river, which include the right of constructing wharves and charging wharf-age, which has never before been in contest between these parties. It is scarcely necessary to say that, in our opinion, the reservation to Taylor confers no new right not already existing m him, either because it had not been parted with, or because it had been expressly, or tacitly, retroceded by those who might have been entitled to it.
That the few inhabitants and lot owners might have tacitly conceded such right of ferry, (if there was any,) as they may have been entitled to under the original dedication, if it is not to be implied from the act of 1795, which must have been understood as reserving that right, is to be conclusively implied from *808 the general acquiescence in the reservation of the right by that act, and from its exercise under claim of right, and without dispute or counter claim, for more than thirty years, and is regarded as conclusively established by the decisions of this court, and by its continued exercise to the present time. On the other hand, the evidence establishes the fact, that for all appropriate public purposes, except those pertaining to the ferry, and the right of ferry, the slip in question, though Taylor may have claimed the legal title since 1799, has been used bjr the town, and its inhabitants, and the public, without disturbance, with scarcely the shadow of a counter claim, and with the general acquiescence of Taylor, and those claiming under him, from the earliest history of the town. And this user, the particlars of which have been before stated, we consider not only as sufficient to sustain the public right under the dedication, but as being in itself sufficient'to establish a dedication. As against James Taylor, the patentee, and his heirs, it might be assumed that the legal title passed to James Taylor, his son, if not by the deed of 1799, by long user and claim of the ferry right as transferred by the deed of 1799, and at least to the extent necessary to sustain that right. But in whoms oever it may have been, and to whatever extent it was held to his use, so far as the ferry right was concerned, and be yond that, to the uses of the dedication.
10. A license under the United States to a coasting vessel, confers no right to transport passengers from one side to the other of the Ohio as a ferry boat, and no authority to transport passengers from the Kentucky to the Ohio side of the river Ohio, with out a [license from’ the authorities of Kentucky.
*808 It follows from these views, that in our opinion there was no error in dismissing the claim of the complainants to an account of wharfage, and the counter claim of the city of Newport to an account of the profits of the ferry. Nor do we perceive any error in the refusal to decree a conveyance of the Esplanade, or any part of the slip, to the city, because if the legal title be in the complainants, or either of them, the unqualified conveyance prayed for might impair the ferry right, to which the city is not entitled, and a qualified conveyance is neither called for, nor necessary to the enjoyment of her *809 rights; and because, more especially, if James Taylor, the testator, had the legal title to any extent, or farther than was necessary to sustain the ferry right, the parties by whom it could be conveyed are notbefore the court. And to this extent the judgment is affirmed on the original and cross appeal. But the judgment is erroneous in the extent to which it perpetuates the injunction, and to which it restrains the Commodore, and the defendants, in landing upon the slip in question, persons and property transported from the Ohio shore; and in adjudging, as ■ it seems to do, the exclusive right of ferrying, from both sides of the river, to be in the plaintiffs alone. The transportation, as carried on, was illegal, and properly in-joined, and the injunction should have been perpetuated against future transportation of a like kind, either under color of any license obtained, or to be obtained, from the authorities of the United States, under the existing laws, or without such license, unless authorized to transport from the Ohio shore, from a ferry established on that side under the laws of that state, and they might have been restrained or prohibited, under all or any circumstances, from transporting persons or property from this to the other side, within the interdicted distance above or below an established ferry on this side, unless authorized under the laws of this state to do so; and the exclusive right of ferrying from the Kentucky side, should have been declared to be in the plaintiffs.
Wherefore, the judgment perpetuating said injunction, and adjudging the exclusive right of ferrying from both sides of the river to be in the plaintiffs, is reversed, and the cause as to that is remanded, with directions to perpetuate the injuction to the extent just indicated, and to adjudge the right as above directed.