## Case No. 1,029.

### BARNEY v. BALTIMORE.

[1 Hughes, 118.] [1]

Circuit Court, D. Maryland. March Term. 1863. [2]

COURTS — JURISDICTION — DIVERSE CITIZENSHIP—REAL PARTIES—PARTITION—DEDICATION.

1. Under the clause of the judiciary act of [September 24,] 1789, [1 Stat. 73,] giving United States circuit courts jurisdiction of certain causes between a citizen of the state where the suit is brought and a citizen of another state, citizenship of one of the suitors in the District of Columbia does not give jurisdiction.

[See note at end of case.]

2. Conveyances of the interests of non-residents made merely for the purpose of giving these courts jurisdiction, do not suffice that purpose.

[See note at end of case.]

3. Before complainant's bill for a partition of property can be entertained by a court, his title must be clear to the portion to be received from the partition.

[See note at end of case.]

4. Where an owner of land exhibits a map of it in which a street is defined, though not yet opened, and sells building lots with front or rear on the street, and makes no express reservation, he dedicates the street for public use; and.

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

[2] [Reversed in 6 Wall. (73 U. S.) 280.]

if in a city, surrenders it for all public purposes, and if the street runs to or binds on a river or bay, surrenders it for use as a wharf where vessels may load and unload; but yet the fee simple will not pass to the city.

[See note at end of case.]

[In equity. Bill for partition of land, by Mary Barney against the mayor and city council of Baltimore, William C. Ridgely, and others. Bill dismissed upon consideration of the merits. Subsequently, on complainant's appeal to the supreme court, the decree was reversed, and the case remanded to this court, with directions to enter a decree dismissing the bill for want of jurisdiction, and without prejudice. Barney v. Baltimore, 6 Wall. (73 U. S.) 280.]

GILES, District Judge. This cause is submitted for final decree on bill, answer, evidence, and admissions filed. The counsel for the respective parties have been fully heard, and in the very learned and able arguments that have been made, almost every case has been cited that could in any way sustain the positions and views of the respective parties. The original bill in this cause was filed on the 26th September, 1848. Various changes have taken place since, in reference to the parties, by death or otherwise, which it will not be necessary to notice; as on the 28th of June, 1860, this court passed the following order: "that the complainant have leave to file an amended and supplemental bill and bill of reviver, as prayed for by her petitions filed 5th July, 1859, and 16th June, 1860; said bill to be filed on or before the first Monday of July next; all questions touching the jurisdiction of this court, in this court, in the said case, either on the original bill or on the bill which may be filed under this order, and also all questions as to the complainant's right of relief in this proceeding, are reserved under the final hearing." The amended bill under this order was filed on the 30th of June, 1860, and the answer of the mayor and city council of Baltimore thereto, on the 21st July, 1860; and it is on the issues which this amended bill and answer present, that this cause has been argued, and upon which I am now to decide. The bill alleges in substance, that the complainant, as one of the heirs of Judge Samuel Chase, is tenant in common with the other defendants, his grandchildren, and with the mayor and city council of Baltimore, grantees of Samuel and Thomas Chase, sons of Judge Chase, of the fee in the bed of West Falls avenue (formerly called "Liffy Street,") and of the City Block, and as such, that she is entitled to a share of the wharfage collected by the city on the west side of Jones's Falls and on the City Block, and to one-sixth part of the City Block. And the bill prays for an account and for a partition between the parties entitled. The bill also states that three of the defendants, to wit, William G. Ridgely, Ann Ridgely, and

Matilda Ridgely are residents of the District of Columbia; that since the filing of the original bill in this case, to wit, on the 8th day of June, 1858, they had conveyed all their interest in the property in question to their brother, Samuel Chase Ridgely; that said Samuel Chase Ridgely has since died, and by his last will and testament devised the said property so conveyed to him by his said brother and sisters back to them. All of the defendants, except the mayor and city council of Baltimore, have filed a joint answer admitting the facts stated in the said bill of complaint. The mayor and city council of Baltimore file a plea, demurrer, and answer, in which they allege that the conveyance made by the said William G. Ridgely and others to Samuel Chase Ridgely was without consideration, colorable and fictitious, and was executed with the intent to give jurisdiction to this court. And that the said grantors in said deed have no legal standing as devisees of Samuel Chase Ridgely to be parties to this bill.

There are also filed in the cause two papers, stating in detail the several facts which have been admitted by the parties. These relate principally to the relationship of the said parties to Judge Chase, and contain the agreement, that either party may offer in evidence the record of the ejectment suit brought by the complainant for this property against the mayor and city council of Baltimore in Baltimore county court; and that the plats, deeds, and evidences may be read from the record in said case, as evidence in the trial of this cause. The only parts of these admissions which it becomes necessary for me to notice particularly, are the following: "It is admitted in this case, that the deed of the 8th of June, 1858, to Samuel Chase Ridgely from William G. Ridgely and others, was made without valuable consideration, and to enable the court to dispose of the case, as if the grantors in the deed had no interest in the matter in question in the cause; it being further understood, that on request of the grantors, the property conveyed by that deed should be passed to the grantors."

Also, "the said William G. Ridgely, Ann C. Ridgely, and Matilda L. Ridgely executed a deed of all their property in Maryland to John G. Proud, Jr., bearing date the 5th of October, 1859; and it is admitted that no consideration was paid by Proud for the grant to him in said deed, but that the same was executed to remove a difficulty in the way of the exercise of the jurisdiction of this court." It is also admitted that Samuel Chase Ridgely died in the summer of 1859. John G. Proud, Jr., is not made a party to the amended bill. The first difficulty which we encounter on the threshold of this case is that in reference to the jurisdiction of this court. The bill shows that three of the defendants are residents of the District of Columbia, and this was also one of the allegations of the original bill. Resting on that statement, if these defendants are indispensable parties to the cause, the case would be one clearly without the jurisdiction of this court; for, by the eleventh section of the judiciary act of 1789, the circuit courts of the United States have jurisdiction in civil suits at common law or in equity only where the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiff or petitioners, or an alien is a party, or the suit is between a citizen of the state where the suit is brought and a citizen of another state. And the supreme court, as early as 1806, in the case of Strawbridge v. Curtiss, 3 Cranch, [7 U. S.] 267, decided that where there are two or more joint plaintiffs or defendants, each of them must be capable of suing or being sued in the courts of the United States to give the court jurisdiction. And this doctrine has never been departed from; for in 1854, in the case of Shields v. Barrow, 17 How. [58 U. S.] 141, the supreme court, in speaking of the act of congress of February 28, 1839, which had been supposed to have altered the rule, say, that "this act does not affect any case where persons having an interest are not joined, because their citizenship is such that their joinder would defeat the jurisdiction." And the court again affirm what they had before decided in Elmendorf v. Taylor, 10 Wheat. [23 U. S.] 167, that, "if the case may be completely decided as between the litigating parties, the circumstance that an interest exists in some other person, whom the process of the court cannot reach, as if such a party be a resident of another state, ought not to prevent a decree upon its merits. But if the case cannot be completely decided, the court should make no decree." And this seems to have been the opinion of the learned counsel for the complainant, for in July, 1859, they file a petition, stating the execution of the deed from William G. Ridgely and others to Samuel Chase Ridgely, and praying that the bill may be dismissed as to them; and by their subsequent petition, filed after the death of Samuel Chase Ridgely, they pray to make the three residents of the District of Columbia parties to the cause, as the devisees of Samuel Chase Ridgely.

Taking these facts, in connection with the written admission (to which I have referred) of the character and objects of this deed to Samuel Chase Ridgely, it shows, beyond any doubt, that the learned counsel felt that unless they could remove this difficulty they could hope for no relief in this court; for this is a bill for partition, and for an account of wharfage received by the mayor and city council of Baltimore. The complainant claims as tenant in common with the defendants. Judge Story, in his treatise on Equity Pleading, section 159, says: "So tenants in common must all sue or be sued in cases touching their common rights and interests;" and as this property, of which a partition is

now claimed, was made at the sole expense of the mayor and city council, if complainant had any interest therein as tenant in common with the city, in making partition the city would be allowed for all expenses of said improvement. For, says the same learned author, in volume 1 of his treatise on Equity Jurisdiction, section 655, in speaking of a case where one party has laid out large sums in improvements on the estate, "Although, under such circumstances, the money so laid out does not in strictness constitute a lien on the estate, yet a court of equity will not grant a partition without first directing an account, and compelling the party applying for partition to make due compensation."

Now, is the question altered by the deed to Samuel Chase Ridgely of the 8th of June, 1858? It was, without consideration, made for the sole purpose of removing, if possible, this difficulty of want of jurisdiction, and with the understanding that Samuel Chase Ridgely was to reconvey the property to the said grantors whenever they requested him so to do. Now, the supreme court has decided that the conveyance of the interests of non-residents to give the circuit court jurisdiction must be real and not fictitious. For this principle, see McDonald v. Smalley, 1 Pet. [26 U. S.] 624; Smith v. Kernochen, 7 How. [48 U. S.] 216. In this last case the supreme court says: "The true and only ground of objection in all these cases is, that the assignor or grantor, as the case may be, is the real party in the suit, and the plaintiff on the record but nominal and colorable, his name being used merely for the purpose of jurisdiction. The suit is then, in fact, a controversy between the former and the defendants, notwithstanding the conveyance; and if both parties are citizens of the same state, jurisdiction, of course, cannot be upheld."

Now, the admission is, in effect, that such is the character of this deed, and that the real parties to the cause remained the same. It will not be necessary for me to notice a similar deed made by these parties since the death of Samuel Chase Ridgely to John G. Proud, Jr., as the counsel have not relied on the same, and Mr. Proud has not been made a party to the cause. But even if this difficulty did not exist, and the courts, from the residence of the several parties interested, had jurisdiction of the case, there is another objection to the court's passing any decree of partition or for an account of wharfage at this time. The title of complainant is disputed, and that being a question of law this court would not undertake to decide it, but its duty would be either to dismiss the bill or retain it for a reasonable time, to give the complainant an opportunity to have it decided at law. In Adams, Eq. (Last Ed.) p. 519, in a note treating of partition, the rule is stated as follows: "But the title of the complainant must be undisputed, otherwise the bill will be dismissed, or else retained until the title is settled at law;" and in support of

it the learned annotator refers to many authorities. In Boone v. Boone, 3 Md. Ch. 497, Chancellor Johnson says: "The court does not sustain a bill for partition unless the title be clear." In Straughan v. Wright, 4 Rand. [Va.] 493, the rule is given in the following language: "Where, in a bill for partition, if complainant's title is denied, and it depends upon doubtful facts or doubtful questions of law, a court of equity will either dismiss the bill or retain it until the right is decided at law." To the same point will be found the following cases: Wilkin v. Wilkin, 1 Johns. Ch. 111; Manners v. Manners, 1 Green, Ch. [2 N. J. Eq.] 384; Bruton v. Rutland, 3 Humph. 435; Hosford v. Mervin, 5 Barb. 52; and Cox v. Smith, 4 Johns. Ch. 271. Now all must concede that the title of complainant depends upon doubtful questions of law. I am justified in saying this because her title has already been submitted to a court of law of her own selection, and which court decided against her, and its judgment was affirmed by the highest court of the state. I speak of the decision of Baltimore county court in the ejectment case of Barney v. Mayor, etc., the record of which has been given in evidence in this case. It was an action brought to recover the identical property, of which a partition is now sought by the bill filed in this cause.

The defendants, in the trial of the case, presented several prayers to the court. The fourth is as follows: "The defendants, by their counsel, pray the court to instruct the jury that if they shall find from the evidence in the case that Samuel Chase, the elder, under whom the plaintiffs claim, made and executed and delivered the several leases and deeds offered in evidence by the defendants, and shall further find from the evidence in the case that at the time of the execution and delivery of the deed from Samuel Chase, the elder, to Samuel Chase, Jr., and Thomas Chase, no part of said street called Liffey street was made south of the southerly line of Lee street, and that no part of the City Block was then made, then the plaintiffs have no right in the suit to recover upon the evidence in the case any portion of Liffey street lying south of the southerly line of Lee street, nor any part of the property located on the City Block." On this prayer the court indorsed, "Granted, but not for the reasons therein stated, but because the plaintiffs have not shown any title to the City Block, and because, although they have shown title to Liffey street, yet, as it is a public highway by dedication and contract with the city, ejectment will not rely to recover it."

Now, as the court of appeals gave no opinion in the case, we do not know whether that court sustained all or what instructions of the lower court, which were fatal to the plaintiff's case; but this is clear, as a part of the block was not used as a highway, ejectment would have lain for that part; and the court of appeals must therefore have sustain-

ed the instruction of Baltimore county court, that as to that part, the plaintiff had shown no title. Now, in this cause, we have no evidence that was not before Baltimore county court, and if I had full jurisdiction in the case, I should feel it to be my duty to dismiss this bill, as it has been filed with full knowledge that the title of the complainant was disputed by the city, and after a court of competent jurisdiction had passed adversely upon the title to a part, if not to all of the property in question. But if the cause was free of these preliminary difficulties, from a careful investigation of the several grounds upon which the complainant's counsel have placed her claim to a share of the property in dispute, I am of the opinion that that claim cannot be sustained either at law or in equity.

Now, what are the facts of this case? Originally the waters of the northwest branch of the Patapsco river swept around the most western point of Fell's Point (east of where the drawbridge now stands), and first turning northeast ran until within about one hundred feet of Bond street, thence turning northwesterly ran nearly up to Wilk street, continuing westerly, passed on to Jones's Falls some distance above where Pratt street now crosses that stream, and thence flowed on westwardly to some distance beyond what is now Light street wharf. That on or about 1796, from the deposits of mud and sand brought down by Jones's Falls and deposited near its intersection with the river, the water of the basin only flowed at high water up to the south side of Pratt street at its intersection with Liffey street, but at low tides the ground was bare for some distance below. It was in this year that Judge Chase received his deed from Daniel Bowly for a lot of ground beginning at the intersection of the south side of Water street with the west side of Jones's Falls, extending south on the west side of the falls to the south side of Barre street, with a width of one hundred and seventy-three feet. Judge Chase then being the owner in fee and riparian proprietor of this lot, fronting one hundred and seventy-three feet on the water of the basin, under permission from the mayor and city council of Baltimore, granted by ordinance passed March 23d, 1802, extended his said lot to the south side of Lee street; and in 1804 he obtained the further permission from the corporation to extend his said lot from the south side of Lee street south three hundred and fifty-five feet, so as to include a bar which had been made by natural causes in the river, opposite to his wharf. This last extension was never completed by Judge Chase. Judge Chase being then the proprietor of this lot binding on the west side of Jones's Falls, laid out into lots first, that part lying between Water and Pratt streets; and subsequently, that part lying between Pratt and south side of Lee street, and along the whole eastern fronts of the lots, he so laid out and leased, and be-

tween said front and the west side of Jones's Falls, he laid out a street or wharf, which below Pratt street he called "Liffey Street." In his lease to James Clarke, in 1798, in describing the lot laid, he calls it "a public wharf" (forty feet wide), and the lines of the lot run to and bind on it. In his lease to Lewis Hart made in 1806, he described the lot leased "as running with Pratt street thirty feet to the west side of a street forty feet wide, laid off by the said Samuel Chase from Pratt street and adjoining the water, heretofore called Jones's Falls, to the south side of Lee street." And in his deed to Samuel Chase, the younger, in 1808, conveying to him in fee five lots, fronting one hundred and fifty feet on this street at the distance of ninety feet south of Pratt street, he describes them as binding on this (Liffey) street, which was delineated on the plat made by him of his said ground. Hart proves, that prior to 1811, he used a part of the head of Liffey street, below Pratt street, as a lumber-yard, and put a gate across it to protect his lumber, although it was then used as a public way; that in 1814 his gate was removed, and it is not denied that since that period it has been used as a public highway and street of the city. That, as it at present exists as a street and wharf, with the large space called the "City Block" at its southeastern extremity, it has been made by the city under various ordinances for the improvement of the "Cove," between the years 1817 and 1836.

There is also in evidence a deed from Thomas Chase and Samuel Chase, two of the children of Judge Chase, to the city in 1818, for the bed of Liffey street, as laid out by their father, Samuel Chase, the elder; but in the view I take of the law in this case, this deed is wholly immaterial, and I shall not further notice it. Now, the first question that presents itself is, was Liffey street ever dedicated to public use as a highway by Judge Chase? Of this I have no doubt. Such dedication may consist in a simple acquiescence, or in positive and unequivocal acts, signifying the owner's intention to give up the soil to this object. Where the dedication is claimed by mere acquiescence on the part of the owner, the use by the public must have been at least twenty years; but a less period will be sufficient where there is any positive assent on his part, showing an intention to appropriate the soil to that purpose. For this, see 3 Kent. Comm. 450, and 2 Smith, Lead. Cas., with Hare & Wallace's Notes, p. 142, the case of Dovaston v. Payne. In the note to this case all the authorities upon the subject are cited. They will be found to maintain this proposition: that if one owning land exhibit a map of it on which a street is defined, though not as yet opened, and building lots be sold by him with a front or rear on that street, this is an immediate dedication of that street for public use. Now the evidence in this case shows that Judge Chase laid out his property

into lots, and bounded them on Liffey street, which he marked out on the plat as a street, and sold and leased his lots with that description. And Baltimore county court (Judge Archer), with the same evidence before it, decided that they constituted a dedication of this street to public use, which will appear by reference to the fifth instruction granted by that court in the ejectment case to which I have referred. Now the important question arises, To what extent is this dedication made? I grant it does not carry the fee to the public, for that remains either in the original owner (which I think is the true rule), or (as some authorities seem to maintain) to those who have purchased lots binding on it. Is it a dedication of only the bare easement of passing over the soil? I am of the opinion that where, in a city, a street which is laid out to bind on or run to the river, is dedicated or surrendered to the public use, it gives the public the right to use it for any purpose for which public streets are used in that city. It makes it public for all purposes, unless some express reservation is made in the act of dedication. Binding on the river it gives the public the right to use it as a wharf and to permit vessels to be loaded and unloaded at it. Angell, in his treatise on Highways, section 301, says: "At common law, a highway is simply an easement or servitude, carrying with it as its incidents the right to use the soil for the purposes of repair and improvement, and in cities for the more general purposes of sewerage, the distribution of light and water, and the furtherance of public morality, health, trade, and commerce."

The supreme court, in the case of City of Cincinnati v. Lessee of White, 6 Pet. [31 U. S.] 437, says: "All public dedications must be considered with reference to the use for which they are made; and streets in a town or city may require a more enlarged right over the use of the land, in order to carry into effect the purposes intended, than may be necessary in an appropriation for a highway in the country." So the right to pass water and gas under the surface of streets, and to lay down railroads on them, has been sustained. Now I propose to show, that wharfage at the ends or sides of public streets belonged to the corporation of Baltimore, except in some few cases where, by the acts of assembly authorizing the improvement, the right to collect the wharfage was given to the parties making the said improvement.

By section 12 of the act of assembly of 1783, c. 24, it was enacted, "that the port wardens of Baltimore town shall be and they are hereby authorized to make such regulations from time to time respecting wharves and wharfage," etc., etc., and the city, which was incorporated in 1796, was vested with all the powers which had heretofore been given to the port wardens; and by the 8th section of the act of incorporation, among the general powers granted, was one to regulate the station, anchoring, and moving of vessels, and to provide for deepening and cleaning the basin and docks. I suppose that the right to regulate and to deepen and clean the docks would carry with it the right to collect wharfage, as a necessary means to give effect to and to enable the corporation to exercise the power especially granted. Whether this be or not, certain it is that the city exercised that right at a very early day in its history. For, by an ordinance passed on the 24th April, 1797 (not quite four months after the act of incorporation), which is entitled "An ordinance to preserve the navigation of the harbor of Baltimore, and to provide for the exercise of the powers heretofore vested in the Port Wardens by the act of assembly," it is enacted and ordained (by its 8th section) that the following wharfages shall be collected for the articles hereafter enumerated, landed at any public wharf within the city limits, etc., etc. And to show what was meant by the term "public wharves," by an ordinance passed March 19th, 1798, it is enacted, "that all wharves made out into the basin or harbor in front of any street or part of a street, and which street was heretofore laid out in the plan of the town as extending to the water, are hereby declared public wharves, and subject to the wharfage imposed and laid by the ordinance of 1797." And this power the city continued to exercise until it was taken away by the act of 1813, but it was restored to the corporation by the act of 1827, c. 162, by which the city was authorized to collect wharfage "on any wharf or wharves belonging to the said mayor and city council, or on any public wharf in said city, other than the wharves belonging to and rented by the state, and that part of Pratt street wharf heretofore used by the citizens of the state." Now there are certain public wharves in the city on which the proprietors of the adjoining property or other individuals collect wharfage, but in those cases the right to do so was expressly reserved to the parties making the improvement.

This was the case in reference to the making of Light street wharf; for by the act of 1796, c. 45, §§ 3, 5, the right to charge wharfage on said wharf was given to the parties, proprietors of lots binding on the same, whose duty it was to fill up and perfect the said improvement. And by the act of 1817, c. 148, in which provision is made for the improvement of Jones's Falls, by its 11th section it is enacted, "that should the mayor and city council succeed in rendering Jones's Falls navigable, they are authorized to collect wharfage upon vessels navigating the same or lying at the public wharves opened or constructed on its banks, provided, that the right to wharfage on Liffey street shall not accrue to the said mayor and city council until they shall have engaged to wharf and fill up said street and deepen said

Falls on the side thereof adjoining said street, if the said street be given up to the said city." This proviso does not say, "if the fee in said street be conveyed to the said city," but, as I read it, if it be surrendered as a highway to said city.

This, I have endeavored to show, had already been done, and the city complied with its part of the said proviso, by filling up and wharfing at said street, and by deepening the said Falls. Now am I right in the view I have taken as to the effect of a dedication of a street to the public, where that street either runs to or binds on navigable water? Is it not reasonable? The corporation of Baltimore is bound to regulate and repair all the public wharves. The natural fund to defray this necessary expenditure is the wharfage, an income derived from those who enjoy the benefit of this expenditure. I am not without authority to sustain me. In the case of City of Newport v. Taylor's Ex'rs, [16 B. Mon. 699,] the right of the town to charge wharfage at the wharf erected at the side of the common, and to establish a ferry from that point across the Ohio, became the subjects of dispute. The common had been set apart for the public use when the ancestor of the defendant had laid out the town, and it was bounded by the Ohio river. The court of appeals of Kentucky decided that the town of Newport had no right to establish a ferry, as the right to do so was a franchise grantable by the legislature, but that the dedication of the common extending to the Ohio river included the right of constructing wharves and charging wharfage. See court's opinion in this case, 16 B. Mon. 804. The great case of City of New Orleans v. U. S., reported in 10 Pet. [35 U. S.] 662, involved the rights of the city to the made ground in its front on the banks of the Mississippi. The city claimed the same by virtue of the fact that all the space of ground which existed between the front line of the houses of the city and the river Mississippi was left by the king of France, under the name of quays, for the use and benefit of the inhabitants, as appeared by authentic copies of the original plans of the foundation of the city. The supreme court, in their opinion, say, on page 717: "If the dedication of this ground to public use be established by the principles of the common law, is it not of the highest importance that the accumulations of the vacant space, by alluvial formations, should partake of the same character, and be subject to the same use, as the soil to which it becomes united? If this were not the case, by the continual deposits of the Mississippi the city of New Orleans would, in the course of a few years, be cut off from the river. If the city can claim the original dedication to the river, it has all the rights and privileges of a riparian proprietor." Now does the case of Dugan v. Mayor, etc., in any way come in conflict with these authorities or with the view I have taken of the effect of the dedication of a street binding on the water? I think not. That was a contest between the parties in reference to which of them the right belonged to charge wharfage on the sides of the dock below Marsh market space, which sides were public streets.

The court of appeals, (5 Gill & J. 374,) decided that it belonged to the city, and (as I read the report of the case) on two grounds: 1st. Because "over wharfage collected at private wharves, or wharves other than those owned by the city, or made at the ends or sides of public streets, lanes, and alleys, the city officers have no power or control. Its imposition and collection is the exclusive privilege of the wharf-owners; with it the officers of the city have no control. It is otherwise with wharfage collected at wharves owned by the city, or at the ends or sides of streets, lanes, and alleys. All these are called public wharves, are common highways, free for the use of the public, but at which tolls were collected by the town, now city, officers." And 2dly, because the commissioners of Baltimore town, who (as proprietors of the market-house lot) had consented to the making of this improvement by Dugan and McElderry, on the express condition "that the said canal wharves and streets on each side of the said canal be a common highway, free for the public use, but subject to such regulations as the commissioners and their successors shall from time to time establish," were not to be held to have relinquished their right to charge wharfage on said wharves. That they meant only that the use of said wharves should be free as all the other public wharves of the city, and did not intend to surrender any right which belonged to them, either as proprietors or as trustees for the public, of charging wharfage on these wharves. Now if the right to regulate, carried with it the right to collect, wharfage, then that right was expressly reserved to the town commissioners in the permission. Again, the public by this dedication is the grantee, and the city for this purpose being its representative, could impose any incumbrance upon the rights of the public within the chartered power of the corporation. And the right of the city to make such a charge is admitted by the act of 1813. In the subsequent cases of Wilson v. Inloes, 11 Gill & J. 351, and Casey v. Inloes, 1 Gill, 430, no question arose in reference to the city's right to collect wharfage on the city dock. The city had made and filled up the property in dispute under their various ordinances for the improvement of the Cove, and the question was, to whose benefit these improvements enured, whether to the holders of parts of "Mounteney's Neck," or to the holders of parts of "Fell's Prospect?" The court of appeals decided that the right to improve this property, under the act of 1745, vested in those holding under the eldest patent (Mounteney's Neck), and

that the improvement made by the corporation, under the ordinance of 1823, must enure to their benefit. But both of these cases decide a very important principle in reference to the act of 1745, which, in my opinion, shuts out the complainant from any part of the City Block. Judge Dorsey says, on page 368, 5 Gill & J., in speaking of the act of 1745: "The improvements authorized and encouraged were those made by improvers in front of their own lots, not of their neighbors." And Judge Stephen, in Wilson v. Inloes, 11 Gill & J. 358, quotes the language of Judge Dorsey in the former cases as announcing the settled law of the court. Now it appears from the plat in this case, that the City Block lies entirely east of the east line of Liffey street, and in no part in front of Judge Chase's original lot as purchased from Bowly, and which original lot he was authorized to extend in a southerly direction by the two permits from the city authorities.

I cannot for one moment suppose that, having extended his lot southerly according to the permission (even if he had completed his improvement), he would have any right to change his front and claim to extend his lot in an easterly direction. In this case such an extension would be for a large part of it in front of the lots on the east side of Jones's Falls. And it appears by one of the plats filed in this cause that, by the first plan proposed for the improvement of the Cove, the Falls was to have run south directly out into the basin, as it had always done, and a pier and drawbridge were to have been made at the foot of Albemarle street, but as this plan would have carried all the deposits of Jones's Falls out into the basin, and would rapidly fill the docks and water at its mouth, to the injury of all the property in that neighborhood, the plan was adopted of turning Jones's Falls eastwardly, connecting the Block with the side of Liffey street, and making the drawbridge at its present site. This plan saved the harbor, and was of great benefit to all those owning property on Liffey street. Now on the plot filed in this case, the line on the west side of Jones's Falls and east side of Liffey street, from the old port wardens' line to the basin, is shown by a line which runs from D to I. Judge Archer, in granting the 7th instruction, asked for defendants in the ejectment case, says: "The court believes that the plaintiff would acquire no right by permission to any land not in front of his lot, and therefore could not have title to the land east of the line from D to I." If, therefore, Baltimore county court was right in this instruction, and of this I have no doubt, the question is asked, In whom then is vested the title to this Block? Let the act of assembly of 1836, c. 63, § 2, answer. That act says "that the mayor and city council of Baltimore shall be and they are hereby vested with the right and title to any land made or to be made out of the water in making and completing the im-

provement of the city dock according to the plan heretofore adopted by them, provided nevertheless, that nothing in this act contained shall be construed to interfere with the vested rights of individuals." For these reasons I will sign a decree dismissing the bill filed in this case with costs.

[NOTE. On complainant's appeal, the supreme court reversed this decree, and remanded the case to the circuit court, with directions to enter a decree dismissing the bill for want of jurisdiction, and without prejudice to complainant's right to bring any suit she may be advised in the proper court. In the course of the opinion of the court, Mr. Justice Miller said: "If the conveyance by the Ridgelys, of the district, to Samuel C. Ridgely, of Maryland, had really transferred the interest of the former to the latter, although made for the avowed purpose of enabling the court to entertain jurisdiction of the case, it would have accomplished that purpose. McDonald v. Smalley, 1 Pet. (26 U. S.) 620, and several cases since, have well established this rule. But, in point of fact, that conveyance did not transfer the real interest of the grantors. It was made without consideration, with a distinct understanding that the grantors retained all their real interest, and that the deed was to have no other effect than to give jurisdiction to the court. And it is now equally well settled that the court will not, under such circumstances, give effect to what is a fraud upon the court, and is nothing more. In the case of Smith v. Kernochen, 7 How. (48 U. S.) 216, this court said: 'The true and only ground of objection in all these cases is that the assignor or grantor, as the case may be, is the real party in the suit, and the plaintiff on the record but nominal and colorable, his name being used merely for the purpose of jurisdiction. The suit is, then, in fact, a controversy between the former and the defendants, notwithstanding the conveyance.' And the court cites McDonald v. Smalley, already mentioned; Maxwell v. Levy, 4 Dall. (4 U. S.) 330; Hurst v. McNeil, Case No. 6,936." [It was further held that the circuit court should render no decree on the merits of the case without having rightfully before it some person representing the interest of the Ridgelys. Barney v. Baltimore, 6 Wall. (73 U. S.) 280.]